IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JUSTIN HEIGIS WINDECKER,<br><br>Defendant. | CR 23-34-BLG-SPW<br><br>ORDER |

Before the Court is Defendant Justin Heigis Windecker's Motion to Suppress. (Doc. 18). Windecker seeks to suppress all evidence seized from his truck on the grounds that law enforcement lacked reasonable suspicion to pull him over and to extend stop beyond its mission. (Doc. 19). Windecker also argues that the search warrant for his truck was deficient because it was not supported by probable cause. (*Id.*). The United States opposes the motion. (Doc. 24).

Neither party requested a hearing. An evidentiary hearing on a motion to suppress is required if the Court concludes from the moving papers that material contested issues of fact exist. *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986).

The Court finds Windecker's motion is suitable for ruling without a hearing because the material facts are not in dispute. In making this determination, the Court reviewed footage from Columbus Police Department Officer Matthew

1

Grieshop's dash camera, wide-angle dash camera, body camera, and police report, as well as the search warrant. (Docs. 19-2, 20, 21). The events of the entire stop are clear from the videos and raise no material facts. Further, the observations and inferences in Officer Grieshop's report and the search warrant are consistent with the footage.

For the following reasons, the Court denies Windecker's motion.

I. **Factual Background**[1]

According to Marsha Olson's police report, she was driving westbound in the passing lane of Interstate 90 in Stillwater County on the afternoon of February 22, 2021,[2] when she saw a black Chevrolet pickup truck approach her "very quickly from behind." (Doc. 19-1 at 3). She wrote that, as soon as she could, she merged into the right lane between two semis, and the truck passed her. She stated a man was driving the truck, and a bright orange jacket was draped over the passenger seat. Olson said she then returned to the passing lane and saw the truck "swerve over nearly side swiping the semi in front of [her]." She recalled that the truck then tried to pass another car and "was clear over the rumble strips[.]" At

---

[1] The facts are based on the parties' briefing (Docs. 19, 24, 25); the search warrant (Doc. 20); Marsha Olson's police report (Doc. 19-1); Officer Grieshop's police report (Doc. 19-2); and video from Officer Grieshop's dash camera, the wide-angle dash camera, and body camera (Doc. 21). The Court will refer to each video as Doc. 21-1, Doc. 21-2, and Doc. 21-3, respectively.
[2] Though Olson wrote in her statement that the incident occurred on March 22, 2021 (Doc. 19-1 at 3), the parties agree the incident occurred on February 22, 2021.

2

this point, according to Olson, the truck also had crossed over the center line multiple times, was driving in the middle of the westbound lanes, and speeding.

Olson called 911 and reported to a Stillwater County dispatcher what she saw. Columbus Police Department Officer Matthew Grieshop responded to the dispatcher's call for assistance and stationed himself in the milemarker 408 median. (Doc. 20 at 5). Shortly after, Grieshop observed a black Chevy pickup truck with an orange jacket on the front passenger seat. (*Id.*; Doc. 21-1; Doc. 21-2). He pulled out onto the interstate and "accelerated hard to catch up" with the truck. (Doc. 19-2 at 2; Doc. 20 at 5). Officer Grieshop followed the truck off Exit 408 in Columbus, reported the license plate to dispatch, and turned on his emergency lights and sirens. (Doc. 20 at 5-6). The truck pulled over.

Officer Grieshop exited his patrol car and approached the driver's side of the truck. (Doc. 21-3 at 00:45). He told the driver, later identified as Windecker, that someone had reported to police that he was speeding and cutting people off. (*Id.* at 00:50-1:01). Windecker said he had been dozing off. (*Id.* at 1:04-1:16). Windecker gave Officer Grieshop his license. When asked for his insurance, Windecker said he was in the process of getting it and gave Officer Grieshop two ID cards that he thought were expired. (*Id.* at 1:20-36). Officer Grieshop asked if the vehicle was registered to Windecker, to which he said he "believe[s] so." (*Id.* at 1:37-43). Windecker explained that his mom and him "go back and forth" on

3

the registration. (*Id.* at 1:44-54). He produced the registration, which listed his name. (*Id.*). Officer Grieshop wrote in his report that Windecker's answers "seemed to be suspicious and not appropriate." (Doc. 19-2 at 2).

Officer Grieshop then asked Windecker if he had drank any alcohol, smoked marijuana, or done any other drugs that day. (Doc. 21-3 at 2:00-04). Windecker denied any use. (*Id.*). When asked if he was on any prescription drugs, he explained he was on Wellbutren and Lexapro, which he said he can drive on. (*Id.* at 2:05-13). Officer Grieshop noticed that Windecker had "very small pinpoint pupils ... like he was on some kind of narcotic," there were air fresheners in the AC/heat vents, and a sweet odor/cover up spray was coming from the truck. (Doc. 19-2 at 2; Doc. 20 at 6).

Officer Grieshop then explained that he was concerned about Windecker based on Olson's traffic complaint. (Doc. 21-3 at 2:15-18). Windecker interrupted him, saying he did not understand why he was being pulled over because he was not "doing anything wrong." (*Id.* at 2:18-39). Windecker continued to interrupt Officer Grieshop and repeatedly deny the accusations in the complaint. (*Id.* at 2:40-3:39). At one point, he briefly grabbed his keys, which were in the ignition, like he was going to start his truck. (*Id.* at 2:58-3:02). Eventually, Officer Grieshop returned to his patrol car to run Windecker's information. (*Id.* at 3:36-42). Windecker had a valid driver's license and no warrants. (*Id.* at 6:07-09).

4

When Officer Grieshop returned to Windecker, Windecker was smoking a cigarette and had put on sunglasses. (*Id.* at 6:33). Officer Grieshop wrote in the search warrant application that "[c]igarette smoke is commonly used to mask odors and calm a person down." (Doc. 20 at 6). He also noted in his report that sunglasses would conceal his eyes. (Doc. 19-2 at 2). Officer Grieshop repeated his reason for pulling Windecker over—the complaint about Windecker reportedly speeding and cutting people off—and asked Windecker to if would be willing to do a field sobriety test. (Doc. 21-3 at 7:07-40). Windecker replied, "yeah, that's fine but I don't understand why." (*Id.* at 7:41-46). Windecker repeated that he was okay. Officer Grieshop's report states: "It was clear that Windecker was not wanting to exit the vehicle." (Doc. 19-2 at 3. *See also* Doc. 20 at 7 ("Windecker was not complying" with orders to get out of his truck)). After three minutes of trying to get Windecker out of the vehicle voluntarily, Officer Grieshop commanded Windecker out. (Doc. 21-3 at 9:24). When Windecker exited of the truck, Officer Grieshop saw a Crown Royal bag, several hanging air fresheners, a bottle of air freshener spray, and a pistol magazine in the truck. (*Id.* at 9:40-42; Doc. 20 at 7; Doc. 19-2 at 3). Officer Grieshop wrote in his search warrant application that Crown Royal bags are "commonly used to conceal drugs and paraphernalia," and that air fresheners and spray are "[c]ommonly used to mask the odors of illegal drugs." (Doc. 20 at 7).

5

Outside the truck, Officer Grieshop again explained the basis for pulling him over and conducting the field sobriety tests. (Doc. 21-3 at 9:58-10:37). Windecker was shaking his head, interrupting Officer Grieshop, and insisting he be able to leave. (*See e.g. id.* at 10:00-05; 10:22-26). Officer Grieshop described Windecker as "confrontational." (Doc. 20 at 7). Windecker ultimately consented to the tests.

Officer Grieshop started with the horizontal gaze nystagmus (HGN) test. Windecker was unable to follow Officer Grieshop's finger as Officer Grieshop moved it horizontally across Windecker's face and out of his periphery without turning his head. (*Id.* at 11:01-13:41). Windecker repeatedly asked Officer Grieshop why he was moving his finger in certain directions. (*See e.g. id.* at 11:10-20; 11:34-12:01; 12:21-30).

Officer Grieshop then had Windecker walk toe-to-heel on the white line for nine steps in each direction. Windecker repeatedly interrupted Officer Grieshop to ask questions, requiring Officer Grieshop to restate instructions he had already given. (*See e.g. id.* at 14:27-39; 14:49-57; 15:29-35). When Windecker started walking, he often swayed and used his arms to balance. (*See e.g. id.* at 16:05-16:22). Officer Grieshop then conducted the one-leg stand test, during which Windecker also swayed, used his arms for balance, and put his foot down on the ground. (*Id.* at 17:17-44; Doc. 19-2 at 3).

6

After the tests, Officer Grieshop returned to the truck, looked through the windows, and noticed a rubber hose in the dash that he believed could be either a sling shot or an arm tourniquet "that looked to be ... for drug use." (Doc. 21-3 at 17:56; Doc. 19-2 at 3; Doc. 20 at 7). He also saw a clear plastic bag with several needles inside in the back seat on the passenger side. (Doc. 20 at 7). Officer Grieshop then told Windecker that based on his performance on the field sobriety test and the contents of Windecker's vehicle that Officer Grieshop observed, he had reason to believe that Windecker was under the influence of narcotics and that Windecker's vehicle contained drugs. (Doc. 21-3 at 19:16). Officer Grieshop asked to search his vehicle. Windecker was adamant that he did not have any drugs in the car and called Officer Greishop's accusations "bullshit" multiple times. (*Id.* at 19:35-22:16). He refused to give consent to search, saying there was no reason for a search.

Officer Grieshop impounded the vehicle and applied for a search warrant the next day. The search warrant was granted, and Officer Grieshop searched the truck. (Doc. 20). Inside, Officer Grieshop found more than 50 grams of methamphetamine, small plastic skull baggies used for individual drug sales, two pistols, and other drug paraphernalia. (*Id.* at 15-16; Doc. 19-2 at 4). On March 16, 2023, Windecker was charged with possession with intent to distribute 5 or more grams of actual methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

7

## II. Legal Standard

### A. *Stop and Seizure*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). Similar to a *Terry* stop, law enforcement only needs reasonable suspicion that a crime has occurred to conduct an investigatory stop or seizure. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (quoting *United States v. Cortez*, 499 U.S. 411, 417-18 (1981)). Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). The standard is "not a particularly high threshold to reach" but "a mere hunch is insufficient." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).

8

In determining whether reasonable suspicion exists, the underlying facts are considered in their totality and in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Further, "[t]he standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer ...." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). The facts justifying a search or a stop must be "known to officers" at the time of the search or stop. *Id.* (citations omitted).

If law enforcement violated Windecker's Fourth Amendment right to be free from "unreasonable searches and seizures" during the traffic stop, "then all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

B.   *Search Warrant*

Where a search is conducted by state law enforcement pursuant to a state warrant and is not otherwise "federal in character," the warrant need only conform to the requirements of the U.S. Constitution, rather than to the procedural requirements of Federal Rule of Criminal Procedure 41. *See United States v. Bookout*, 810 F.2d 965, 967 (10th Cir. 1987). Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

9

and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Accordingly, to satisfy the probable cause requirement, there must be a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Needham*, 718 F.3d 1190, 1194 (9th Cir. 2013).

### III. Analysis

Windecker argues that Officer Grieshop did not have reasonable suspicion for the initial traffic stop or to extend it. (Doc. 19). He also argues probable cause did not exist for the issuance of the search warrant. (*Id.*). The Government disagrees, contending that the stop, its extension, and the search warrant were justified. The Court will discuss each of Windecker's arguments in turn.

### A. *Reasonable Suspicion to Pull Over Windecker*

An officer does not need to personally observe criminal conduct to form reasonable suspicion to conduct an investigatory stop. *Navarette v. California*, 572 U.S. 393, 397 (2014). Rather, an officer may rely on information from a tip. *Id.*; *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2016). "In assessing the role of telephone tips in investigative stops, the Supreme Court and our court have

focused on whether the tips have 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Williams*, 846 F.3d at 308 (citing *Alabama v. White*, 496 U.S. 325, 327 (1990); *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014)). The factors the Court applies to assess the reliability of a tip are whether: (1) the caller had eyewitness knowledge of the incident; (2) police corroborated the tip; (3) the caller used the 911 system; and (4) the caller reported a specific and potentially on-going crime. *Navarette*, 572 U.S. at 399-401. Non-anonymous tips are "entitled to greater reliability." *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004).

Windecker argues that Officer Grieshop did not have reasonable suspicion that Windecker was committing a crime when Officer Grieshop pulled him over, in violation of Windecker's Fourth Amendment rights, because (1) Officer Grieshop did not witness Windecker speeding or driving erratically; (2) Officer Grieshop could not see the orange jacket in the cab of Windecker's vehicle; and (3) Olson failed to state that a crime or criminal activity was afoot. (Doc. 19 at 5-6).

The Government contends that Olson's call was reliable, giving Officer Grieshop reasonable suspicion to believe Windecker violated Montana traffic laws, namely Mont. Code Ann. § 61-8-303 (speeding), § 61-8-302 (careless driving), and § 61-8-1002 (driving under the influence). (Doc. 24 at 7-8).

11

The Court agrees with the Government that Olson's tip provided Officer Grieshop reasonable suspicion to stop Windecker because it was sufficiently reliable. As an initial matter, under *Navarette*, Officer Grieshop did not need to "surveil [Windecker's truck] at length in order to personally observe suspicious driving" if Olson's tip was reliable. 572 U.S. at 404. Applying the *Navarette* factors for reliability, Olson's tip satisfies each factor. Olson used the 911 system to report that she personally witnessed a black Chevy truck with an orange jacket on the front seat swerve and nearly side swipe the semi, cross the center lane multiple times, cross the rumble strips, and speed. (Doc. 19-3 at 3). Such conduct constitutes, at minimum, potential violations of the Montana statutes prohibiting speeding and careless driving. Though Windecker argues that Olson's failure to identify this conduct as criminal negates the reliability of her tip, this omission is irrelevant under *Navarette*. 572 U.S. at 395 (tipster only reported that the defendant ran her off the road, not that he committed a crime).

Officer Grieshop also corroborated Olson's tip. His report states that, while waiting in the median after he responded to dispatch, he saw a truck matching Olson's description: a black Chevy pickup with an orange jacket on the passenger seat. Windecker asserts that the orange jacket is not visible in the dash cam footage, presumably in an attempt to argue that Officer Grieshop could not have verified that Windecker's truck was the one Olson described. (Doc. 19 at 6).

12

However, grainy dash cam footage of a vehicle traveling at a high speed is not sufficient to put in dispute Officer Grieshop's statement under oath in his affidavit that he saw the jacket. Since Windecker provides no further evidence to disprove Officer Grieshop's affidavit, the Court takes Officer Grieshop's account as true and finds that he corroborated Olson's tip.

Given that all the *Navarette* factors weigh in favor of the reliability of Olson's tip, and that Olson identified herself, the Court finds Olson's tip was sufficiently reliable to give Officer Grieshop reasonable suspicion to conduct an investigatory stop on Windecker.

B.   *Reasonable Suspicion to Extend the Traffic Stop*

The Court next will address whether Officer Grieshop had reasonable suspicion to extend the stop beyond its mission. If a person is stopped for violating the traffic code, the stop may not be prolonged beyond the time reasonably required to complete the mission of the stop absent independent reasonable suspicion to detain the person further. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The mission of the stop consists of determining whether to issue a ticket for the infraction and inquiries ordinary to enforcing the traffic code. *Id.* at 355. Such inquiries include checking the driver's license, determining whether the driver has outstanding warrants, and inspecting the automobile's registration and proof of insurance. *Id.*

Authority for the stop ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Id.* at 354.

To undertake inquiries unrelated to the mission of the stop and that prolong the stop, an officer must have reasonable suspicion of an offense other than the traffic violation. *Id.* at 355. If reasonable suspicion exists, the unrelated inquiry must be "designed to return information about" the specific suspected criminal activity. *United States v. Evans*, 122 F. Supp. 3d 1027, 1037 (D. Nev. 2015).

Windecker argues that the stop should have ended after the routine checks on him came back clear because "there [was] nothing Grieshop had seen to conclude that Windecker was impaired" to justify prolonging the stop to conduct the field sobriety tests. (Doc. 19 at 8). Windecker was not slurring his words, and Officer Grieshop did not smell alcohol. (Doc. 25 at 4). As for the suspicious behaviors noted by Officer Grieshop, Windecker provides a variety innocent explanations. For instance, he contends that pinpoint pupils can "occur due to bright light and possibility looking far away similar to when people are driving on the highway." (*Id.* at 5). Additionally, "there is nothing wrong with someone smoking when surrounded by several different law enforcement officers. Moreover, perhaps, Windecker simply wanted to smoke." (*Id.* at 5).

The Court finds that Officer Grieshop had reasonable suspicion that Windecker was engaged in criminal activity other than the traffic offense that

justified his extension of the traffic stop. Officer Grieshop observed multiple indicators of drug impairment and possession as soon as he made contact with Windecker: Windecker's pinpoint pupils, the air fresheners and sweet odor coming from inside the truck, Windecker's inability to remember if the truck was registered to him, and his failure to understand why he was being pulled over despite Officer Grieshop's repeated explanations. When Officer Grieshop returned from his patrol car after doing the warrant checks, Windecker had put on sunglasses and was smoking a cigarette, which Officer Grieshop inferred could have been a way to mask his intoxication and any smells.

Windecker's attempts to explain away each of his suspicious behaviors overlook the requirement that the Court consider the facts in their totality and in light of an officer's training and experience. Considering Windecker's suspicious behaviors, the suspicious items/smells observed by Officer Grieshop, and Olson's characterization of his erratic and dangerous driving in their totality and in light of Officer Grieshop's training and experience, they established particularized and objective suspicion that Windecker was under the influence. Since a field sobriety test is designed to return information about a person's intoxication, Officer Grieshop's decision to perform the tests was proper.

Contrary to Windecker's characterization of his performance in the field sobriety test as exemplary and dispelling any suspicions of intoxication, Officer

Grieshop's body cam footage demonstrates that the field sobriety test served to bolster Officer Grieshop's suspicions. Windecker repeatedly moved his head during the HGN test, swayed and used his arms to balance during the walking test and one-leg stand, and put his foot down during the one-leg stand. He also consistently could not comprehend Officer Grieshop's instructions, requiring Officer Grieshop to repeat them, and questioned their purpose. Far from "pass[ing] the test with flying colors," as Windecker contends (Doc. 19 at 8), the record is clear that Windecker's performance provided reasonable suspicion—if not probable cause—that he was intoxicated.

At this point, Officer Grieshop also had observed the Crown Royal bag, which law enforcement typically associates with illegal drug use. Given Windecker's intoxicated behavior and his other observations, Officer Grieshop rightfully inferred based on his training that the Crown Royal bag might contain narcotics. The rubber hose and needles he saw after the field sobriety test further affirmed the suspicion of intoxication and possession of narcotics.

Accordingly, Officer Grieshop had reasonable suspicion of intoxication and drug possession to extend the traffic stop beyond the routine checks. Windecker's actions and Officer Grieshop's observations throughout the stop sustained, if not enhanced, Officer Grieshop's reasonable suspicion. The stop did not violate Windecker's Fourth Amendment rights.

### C. Probable Cause to Impound the Truck and Obtain the Search Warrant

Windecker lastly challenges the search warrant for Windecker's truck, arguing that Windecker's behavior "should not have raised any suspicion," let alone probable cause. (Doc. 19 at 14-15).[3] The Government maintains that the facts in the affidavit, when considered in their totality, provided a substantial basis for the state court's finding of probable cause. (Doc. 24 at 15).

The Court agrees with the Government that probable cause existed to justify the search warrant. The affidavit describes how Windecker displayed multiple signs of intoxication—inability to maintain his lane, speeding, pinpoint pupils, inability to remember if his truck was registered to him and if he had car insurance, inability to comprehend basic directions, confrontational and confused behavior—and his vehicle contained multiple items associated with drug use and covering up drug use—the Crown Royal bag, rubber hose, needles, air fresheners, and cover-up odor spray. It also describes how he put on sunglasses and started smoking during the stop, further indicating he possibly was trying to cover up his intoxication. Considering all these facts together and in light of Officer Grieshop's training, the

---

[3] On reply, Windecker also alleges that reasonable suspicion did not exist to impound the truck. (Doc. 25 at 8). The Court will not consider this argument given the Government did not have a chance to respond. However, even if briefed, the Court's findings on reasonable suspicion in the previous section would apply to the impoundment. No intervening events that could have dispelled Officer Grieshop's suspicions occurred during the minutes between his last look into the truck and his decision to impound the vehicle.

17

search warrant demonstrates that there was a fair probability that Windecker had drugs in his vehicle.

Windecker again maintains that Officer Grieshop's "conclusory statements" about Windecker's pupils and [sic] air freshener are "belie[d]" by the dash-cam footage. (Doc. 19 at 15). As discussed, the dash-cam footage does not undermine but rather corroborates the observations and inferences in Officer Grieshop's affidavit. Thus, the search warrant was supported by probable cause.

## IV. Conclusion

For these reasons, Officer Grieshop had reasonable suspicion to stop Windecker and conduct an extended investigation into separate criminal activity. Further, the search warrant was supported by probable cause. Accordingly, Windecker's Fourth Amendment rights were not violated.

IT IS SO ORDERED that Justin Heigis Windecker's Motion to Suppress (Doc. 18) is DENIED.

DATED this 18th day of July, 2023.

SUSAN P. WATTERS
United States District Judge